# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAPEER MOORE, | 1:09-cv-00482-LJO-DLB (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| JAMES D. HARTLEY, Warden | [Doc. 1] |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation for his convictions of second degree murder, arson, and use of a knife during the commission of the crimes. Petitioner is serving an indeterminate term of twenty four years to life.

In the instant petition for writ of habeas corpus, Petitioner does not challenge the validity of his conviction; rather, he challenges the Board of Parole Hearings' (hereinafter "Board") July 30, 2007 decision finding him unsuitable for parole.[1]

Petitioner filed a petition for writ of habeas corpus in the San Diego County Superior

---

[1] Although Petitioner mentions two separate parole hearings in his petition, and does not specifically state which hearing he is challenging, the Court presumes he is challenging the 2007 decision as he refers to the exhibit containing the transcript of that decision.

1

1 Court challenging the Board's decision. (Exhibit 1, to Answer.) The superior court denied the
2 petition finding there was some evidence to support the finding that Petitioner was not suitable
3 for release on parole. (Exhibit 2, at 4, to Answer.)
4 Petitioner then filed a petition for writ of habeas corpus in the California Court of Appeal,
5 Fourth Appellate District. (Exhibit 3, to Answer.) The petition was denied for failure to provide
6 an adequate record for review, with citation to People v. Duvall, 9 Cal.4th 464, 474 (1995).
7 (Exhibit 4, to Answer.)
8 Petitioner filed a petition for writ of habeas corpus in the California Supreme Court,
9 which was summarily denied. (Exhibit 5, to Answer; Exhibit 11, to Petition.)
10 Petitioner filed the instant federal petition for writ of habeas corpus on March 16, 2009.
11 (Court Doc. 1.) Respondent filed an answer to the petition on June 9, 2009, and Petitioner filed a
12 traverse on July 20, 2009. (Court Docs. 11 & 13.)

13                         STATEMENT OF FACTS[2]

14 In the early morning hours of April 4, 1989, Petitioner stabbed his cousin, Angelique
15 Dhue, twenty-two times and ignited her apartment on fire. After receiving two Crime Stopper
16 Tip information sheets, police contacted and interviewed Petitioner on the evening of April 4,
17 1989. Petitioner gave numerous conflicting stories about his contact with the victim and the
18 events leading up to her death. Petitioner initially claimed that he went to the victim's apartment,
19 which was located upstairs from the apartment he shared with his girlfriend, Regina Sonders, the
20 evening before the murder. He claimed that he and the victim shared some drugs, and then
21 returned home. He went back to the victim's apartment a short time later to borrow $50 for more
22 drugs. Petitioner initially indicated that the victim was extremely agitated and depressed,
23 threatened suicide, was behaving crazy, and he had no involvement with her death. He also
24 denied any involvement or knowledge of the fire in her apartment.[3]

---

[2] This summary of information is derived from the 2007 Board hearing transcript, which quoted from the Probation Officer's Report.

[3] During the course of the investigation, police spoke to an employee at a Chief Auto Parts Store in El Cajon, who confirmed that Petitioner bought a one gallon gas can on April 4, 1989, shortly after 12:00 p.m. and she recalled that Petitioner was extremely nervous.

Petitioner finally admitted to investigators that he went to the victim's home at approximately 4:00 a.m. on April 4, 1989. He borrowed some money from her for drugs, went out and bought it, and then returned to her apartment where they shared the drugs. Petitioner then indicated that the victim became angry, demanded the return of her money, and got a knife from her kitchen and approached him. A struggle ensued and Petitioner grabbed the victim and threw her down. Petitioner admitted that he stabbed the victim once in the neck with the knife, and it was bleeding profusely. He left the apartment between 5:00 and 6:00 a.m., and turned on the gas. He returned to his apartment and was unable to sleep. He admitted that he threw his clothes in the dumpster behind the nearby apartment, but denied setting the fire or buying any gas. Petitioner claimed that he went to check on the victim at his girlfriend's request and when he approached her apartment an explosion occurred and he left.

The autopsy report found that the victim suffered a total of twenty-two stab wounds, three superficial stab wounds to the chin, sixteen wounds to the neck with penetrations in the hypo thorax, carotid cartilage, left carotid artery, left jugular vein, one stab wound in the upper left chest penetrating the left lung, and a stab wound to the right breast. In addition, there was small abrasions to the victim's left knee and hand, contusions to the left lateral knee and right interior thigh, singeing of her hair, and soot deposit on her skin. The cause of death was multiple stab wounds. There was semen found on a vaginal swab taken from the victim, and upon testing Petitioner could not be excluded as the individual depositing the semen.

## DISCUSSION

I.    Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its

1  provisions.

2      Petitioner is in custody of the California Department of Corrections pursuant to a state
3  court judgment. Even though Petitioner is not challenging the underlying state court conviction,
4  28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the
5  threshold requirement of being in custody pursuant to a state court judgment. Sass v. California
6  Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370
7  F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a
8  state prisoner in custody pursuant to a state court judgment, even when the petition is not
9  challenging [her] underlying state court conviction.'").

10      The instant petition is reviewed under the provisions of the Antiterrorism and Effective
11  Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63,
12  70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the
13  adjudication of the claim "resulted in a decision that was contrary to, or involved an
14  unreasonable application of, clearly established Federal law, as determined by the Supreme Court
15  of the United States" or "resulted in a decision that was based on an unreasonable determination
16  of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C.
17  § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

18      As a threshold matter, this Court must "first decide what constitutes 'clearly established
19  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,
20  *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this
21  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as
22  of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other
23  words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or
24  principles set forth by the Supreme Court at the time the state court renders its decision." Id.

25      Finally, this Court must consider whether the state court's decision was "contrary to, or
26  involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at
27  72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may
28  grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]

Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

II.     Review of Petition

A parole release determination is not subject to all the due process protections of an adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see also Greenholtz, 442 U.S. at 12 (explaining that due process is flexible and calls for procedural protections that particular situations demand). "[S]ince the setting of a minimum term is not part of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not

constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at 1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole board proceeding, the only process to which an inmate is entitled is: 1) the inmate must receive advance written notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be afforded an "opportunity to be heard," Greenholtz, 442 U.S. at 16; 3) if the inmate is denied parole, the inmate must be told why "he falls short of qualifying for parole," Id.; and 4) the decision of the Board must be supported by "some evidence" having an indicia of reliability. Superintendent, Mass. Correc. Inst. v. Hill, 472 U.S. 445, 455 (1985); Cato v. Rushen, 824 F.2d 703, 705 (9th Cir.1987).

"In Superintendent v. Hill, the Supreme Court held that 'revocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record.' 472 U.S. 445, 454 (1985), *quoting* Wolff v. McDonnell, 418 U.S. 539, 558 (1974)." Sass, 461 F.3d at 1128. In determining whether the "some evidence" standard is met, the Court need not examine the entire record, independently assess the credibility of witnesses, or re-weigh the evidence. Id. Rather, the Court must determine whether there is any evidence in the record that could support the conclusion of the disciplinary board. Id., *citing* Superintendent v. Hill, at 455-56. Although Hill involved the accumulation of good time credits, the same standard applies to parole, as both situations "directly affect the duration of the prison term." Id., *citing* Jancsek v. Oregon Bd. of Parole, 833 F.2d at 1390.

In making a determination whether an inmate is suitable for parole, the Board is guided by the following regulations:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.
>
> (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of

1 treatment or control, including the use of special conditions under which the prisoner may
2 safely be released to the community; and any other information which bears on the
prisoner's suitability for release. Circumstances which taken alone may not firmly
3 establish unsuitability for parole may contribute to a pattern which results in a finding of
unsuitability.

4 15 Cal. Code Regs. §§ 2402(a) and (b).

5      In this case, with regard to the procedural protections outlined in Greenholtz, Petitioner

6 was provided all that is required. Petitioner was given advance notice of the hearing, he was

7 offered representation by counsel at the hearing, he was granted an opportunity to submit

8 materials for the Board's consideration and an opportunity to be heard during the hearing, and he

9 was provided a written decision explaining the reasons why parole was denied. See Exhibit 1, to

10 Answer, Attachment 1.

11      The California Supreme Court clarified the standard of the review applicable to parole

12 decisions by the Board or Governor in In re Lawrence, 44 Cal.4th 1181 (2008). The applicable

13 standard "is whether some evidence supports the *decision* of the Board or the Governor that the

14 inmate constitutes a current threat to public safety, and not merely whether some evidence

15 confirms the existence of certain factual findings." Id. at 1212 (emphasis in original and citations

16 omitted). As to the circumstances of the commitment offense, the Court concluded that

17 although the Board and the Governor may rely upon the aggravated circumstances
of the commitment offense as a basis for a decision denying parole, the aggravated
18 nature of the crime does not in and of itself provide some evidence of current
dangerousness to the public unless the record also establishes that something in
19 the prisoner's pre- or post-incarceration history, or his or her current demeanor
and mental state, indicates that the implications regarding the prisoner's
20 dangerousness that derive from his or her commission of the commitment offense
remain probative to the statutory determination of a continuing threat to public
21 safety.

22 Id. at 1214.[4]

23      At Petitioner's second parole hearing in 2007, the Board found him unsuitable for release

24 based not only on the circumstances of Petitioner's commitment offense, but also on the

---

26     [4] To this end, the Court recognized that its prior determination of "a focus upon the egregiousness of the
27 commitment offense to the exclusion of other relevant evidence has proved in practice to obscure the core statutory
emphasis upon current dangerousness, the manner in which courts apply the some evidence standard in evaluating
28 the evidentiary value of the gravity of the commitment offense requires some clarification." In re Shaputis, 44
Cal.4th 1241, 1254 (citing Lawrence, 44 Cal.4th at 1213-1214.)

equivocal psychological report, insufficient understanding of the consequences and process of his addiction status, and questionable parole plans concerning his potential employment.

With regard to the commitment offense, the Board found it was carried out in a manner which demonstrates an exceptional callous disregard for human suffering.[5] Petitioner was initially charged with first degree murder and received a second degree murder conviction as a result of his guilty plea. (Exhibit 1, to Answer, Transcript, at 49.) The victim, Petitioner's cousin, was stabbed 22 times over her refusal to give him money to buy drugs. The autopsy report found that the victim suffered twenty-two stab wounds to the chin, sixteen wounds to the neck with penetrations in the hypo thorax, carotid cartilage, left carotid artery, left jugular vein, one stab wound in the upper left chest penetrating the left lung, and a stab wound to the right breast. In addition, there was small abrasions to the victim's left knee and hand, contusions to the left lateral knee and right interior thigh, singeing of her hair, and soot deposit on her skin. The cause of death was multiple stab wounds. When paramedics arrived at the victim's apartment, her body was in "full rigor mortis." (Id. at 104.) As the Board noted it "takes a while, and we can only guess at the abject terror that the victim was going through as the blood was coming out of her body and her life was drawing to a close. So the murder was not quick, and it was not compassionate in any way. It was long and drawn out." (Id. at 103.) Even after the stabbing, Petitioner left the apartment, went to a convenience store and purchased a gallon of gasoline, then set the victim's apartment on fire in an attempt to destroy any evidence. The stabbing of his cousin 22 times and then setting her apartment on fire obviously resulted in her being abused, mutilated, and/or defiled, demonstrating an exceptional callous disregard for human suffering

---

[5] Pursuant to Title 15, of the California Code of Regulations, Section 2402(c) sets forth circumstances tending to demonstrate unsuitability for parole when the prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
 (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
 (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
 (C) The victim was abused, defiled or mutilated during or after the offense.
 (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
 (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

15 Cal.Code Regs. § 2402(c)(1)(A)-(E).

8

under §§ 2402(c)(1)(C), (D), and some evidence supports the Board's finding taht Petitioner remains a risk to public safety.[6]

Although the Board noted that multiple victims were attacked or threatened, it is questionable whether there is some evidence to support such finding given there is no evidence that any other individual was actually injured. However, it is irrelevant given the other independent factors supporting the Board's ultimate finding.

The Board next considered the psychological report authored by Dr. George in 2007. The Board recognized that there were two areas that were favorable to Petitioner, it was not totally supportive of release. The Board quoted from Dr. George's report stating:

> However, when asked during the 4/19/07 interview if he considered himself addicted to any drugs, the inmate replied not any more. When further queried by the undersigned regarding this issue, the inmate then stated that he is, "Choosing not to use drugs, don't want to use drugs." And that he will always be addictive personality, but did not - - his belief of not being addicted to any substance. The inmate beliefs are contradictory to the tenets of AA and NA in which the inmate has, parenthesis, according to his self reported [sic] been persistent since his incarceration for the controlling offense.

(Exhibit 1, to Answer, Transcript, at 107.)

The Board further pointed out that the psychological report stated:

> While the inmate reported not planning on using alcohol in the future, he also stated that he's not currently addicted to alcohol, putting into question the depth of his understanding of the addiction process.

(Id. at 108.)

Petitioner admitted that he was under the influence of crack cocaine and alcohol at the time of the commitment offense and had not slept for two or three days. Petitioner stated that he began using marijuana in the Eighth or Ninth grade. He then began using rock cocaine in 1988 when he was enlisted in the Army and continued his use until the time of the commitment offense in 1989.[7] (Exhibit 1, to Answer, Transcript, at 43-44, 46.) Petitioner supported his drug

---

[6] This is supported by the fact that the victim's family was deprived by a physical viewing of the victim's body at her burial services due to the magnitude of her injuries. (Exhibit 1, to Answer, Transcript, at 110.)

[7] The Board also noted that Petitioner had a previous arrest record, which included a felony conviction for possession of a controlled substance in 1988, in which he received jail time. (Exhibit 1, to Answer, Transcript, at 105.)

habit by stealing from others, including his own mother. (Id. at 47.)  There is no doubt that drugs were a contributing factor in the commission of the instant offense, as Petitioner's memory of the factual circumstances surrounding the offense is severely limited due to his heavy consumption of drugs. (Id. at 25, 29.)  "The Board agreed with Dr. George's assessment and felt that Petitioner needed to work more on these issues." (Exhibit 2, to Answer, Sup. Ct. Opinion, at 5.) The Board recommended that Petitioner review the portion of the program concerning the understanding that a determined alcoholic is always an alcoholic.  The Board recommended that Petitioner be "secure in his understanding that he is an alcoholic, and it is not necessarily just a choice on his part not to be or to be." (Exhibit 1, to Answer, Transcript, at 108.)  While Petitioner's participation in Alcoholics Anonymous and Narcotic Anonymous ("AA/NA") is certainly commendable, given the significant role that alcohol played in the commission of the offense, there is some evidence to support the Board's finding that further insight into his addiction is necessary. Petitioner's lack of complete understanding of the consequences of such addition is crucial to the determination of whether he remains a risk to public safety if released and some evidence supports this finding.[8]

       The Board considered Petitioner's institutional behavior which consisted of only one CDCR-115[9] for evasion of attendance in June of 1992, and seven CDCR-128's,[10] the last in February of 2001 for misuse of State property.  As stated by the Superior Court, "[t]he Board noted that none of these were recent, and did not enter into, or weigh heavily, in their decision. They congratulated him on turning some of the issues around for himself." (Exhibit 2, to Answer, Sup. Ct. Opinion, at 5.)

       The Board also considered Petitioner's parole plans. (15 Cal. Code. Regs. § 2402(d)(8)).

---

[8] To the extent Petitioner contends that the Board was not authorized to rely on his status as an addict to deny parole, it is without merit.  The Board is authorized by statute to consider all relevant and reliable information, including his past and present mental state.  15 Cal. Code. Regs. § 2402(b).

[9] A CDCR-115 documents misconduct which is a violation of law or which is not minor in nature.  15 Cal. Code. Regs. § 3312(a)(3).

[10] A CDCR-128 documents misconduct that is minor in nature and "recurs after verbal counseling or if document[ation] of minor misconduct is needed."  15 Cal. Code. Regs. § 3312(a)(2).

Insufficient parole plans is an unsuitability factor, and may constitute "some evidence" that Petitioner is currently dangerous. See Lawrence, 44 Cal.4th at 1228-1229 (citing approvingly In re Honest, 130 Cal.App.4th 81, 97 (2005) (finding some evidence to support denial of parole based on inadequate parole plans, unstable social history, and inadequate participation in prison programs).) The Board expressed concern regarding the industry in which Petitioner was seeking employment. Petitioner expressed his desire to be a technician and make eyeglasses. He mentioned that the industry is constantly changing and he would need placement in a different facility to receive such training. Petitioner admitted that "he is constantly changing with regard to what type of work he wants to do in the eyeglass industry." (Exhibit 2, to Answer, Sup. Ct. Order, at 6.) Thus, it was unclear to the Board whether Petitioner would have the skills necessary for employment in his desired industry if the necessary training was not provided. The Board otherwise commended Petitioner on his choice to seek transitional housing in lieu of rushing to get married and began a new life. However, given Petitioner's uncertain employment plans upon release, the Board was not presented with viable employment and some evidence supports its finding.

In addition, it is also significant under existing Ninth Circuit authority, that at the time of the 2007 hearing, Petitioner had not yet served the minimum term of his 24-years-to-life sentence.[11] Thus, the due process concern regarding continued reliance on the immutable circumstances of the commitment offense as a basis to deny parole is not yet implicated. Moreover, as explained *supra*, the Board relied on other factors, in addition to the circumstances of the commitment offense, in finding Petitioner unsuitable for parole.

---

[11] In Biggs v. Terhune, 334 F.3d 910, 916-17 (9th Cir. 2003), the Ninth Circuit stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Although a denial of parole initially can be justified by relying on the gravity of the offense, over time, "should [the prisoner] continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interest in parole." Irons v. Carey, 505 F.3d 846, 853 (9th Cir. 2007), *citing* Biggs, 334 F.3d at 916. Nevertheless, as in this case, in both Irons and Biggs, the Ninth Circuit upheld the denials of parole because in each of these cases the prisoner had not yet served the minimum term of his sentence.
   In this case, Petitioner's life term began in 1994, and at the time of the 2007 hearing, he had only served approximately 13 years of his 15-years-to-life sentence on the second degree murder charge-Petitioner's total sentence was 24-years-to-life, including the enhancements for the arson and use of knife charges.

11

1 The Board also considered the factors in favor of Petitioner's release on parole. The
2 Board commended Petitioner for his participation in AA and NA, participation in his religious
3 endeavors, self-help efforts, effort to pay the restitution fine owed to the victim's family, and
4 desire to seek transitional housing upon release. (Exhibit 1, to Answer, Transcript, at 109.)

5 Petitioner contends that the Board improperly relied on evidence that he raped the victim
6 in violation of his plea agreement. Although the Board noted that there was some evidence that a
7 sexual assault may have occurred, it was specifically pointed out that Petitioner was not *charged*
8 *of it*, and there is no showing of a violation of his plea agreement.

9 In conclusion, the factors of the commitment offense, coupled with Petitioner's lack of
10 understanding of his substance abuse problem, inconclusive psychological report, and
11 insufficient parole plans provide "some evidence" that Petitioner continues to be a risk to public
12 safety if released. See In re Lawrence, 44 Cal.4th at 1212, 1221 ("the relevant inquiry is whether
13 the circumstances of the commitment offense, when considered in light of other facts in the
14 record, are such that they continue to be predictive of current dangerousness many years after
15 commission of the offense." "It is not the existence or nonexistence of suitability or unsuitability
16 factors that forms the crux of the parole decision; the significant circumstance is how those
17 factors interrelate to support a conclusion of current dangerousness to the public.") Therefore, it
18 cannot be said that the state court's resolution of Petitioner's claims "resulted in a decision that
19 was contrary to, or involved an unreasonable application of, clearly established Federal law, as
20 determined by the Supreme Court of the United States" or "resulted in a decision that was based
21 on an unreasonable determination of the facts in light of the evidence before the state court."

## RECOMMENDATION

23 Based on the foregoing, it is HEREBY RECOMMENDED that:
24 1. The instant petition for writ of habeas corpus be DENIED; and,
25 2. The Clerk of Court be directed to enter judgment in favor of Respondent.
26 This Findings and Recommendation is submitted to the assigned United States District
27 Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of
28 the Local Rules of Practice for the United States District Court, Eastern District of California.

Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **August 2, 2009**            /s/ **Dennis L. Beck**
                                    UNITED STATES MAGISTRATE JUDGE